UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CARMEN HERNANDEZ,                    :
        Plaintiff,                   :
                                     :
     v.                              :      CA 09-428 ML
                                     :
MICHAEL J. ASTRUE,                   :
COMMISSIONER OF                      :
SOCIAL SECURITY,                     :
        Defendant.                   :

**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

     This matter is before the Court on the request of Plaintiff
Carmen Hernandez ("Plaintiff") for judicial review of the
decision of the Commissioner of Social Security ("the
Commissioner"), denying Supplemental Security Income ("SSI"),
under §§ 205(g) and 1631(c)(3) of the Social Security Act, as
amended, 42 U.S.C. §§ 405(g) and 1383(c)(3) ("the Act").
Plaintiff has filed a motion to reverse the decision of the
Commissioner.  Defendant Michael J. Astrue ("Defendant") has
filed a motion for an order affirming the decision of the
Commissioner.

     This matter has been referred to me for preliminary review,
findings, and recommended disposition pursuant to 28 U.S.C. §
636(b)(1)(B).  I find that the Commissioner's determination that
Plaintiff is not disabled is not supported by substantial
evidence in the record and contains legal errors.  Accordingly,

for the reasons set forth herein, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (Docket ("Dkt.") #7) ("Motion to Reverse") be granted and that Defendant's Motion for an Order Affirming the Decision of the Commissioner (Dkt. #8) ("Motion to Affirm") be denied.

## Facts and Travel

Plaintiff was born in 1966.  (Record ("R.") at 132)  She completed at least the eighth[1] grade and has past relevant work experience as a certified nursing assistant and a machine operator.  (R. at 16-17, 46, 160, 165)

Plaintiff filed an application for SSI on February 2, 2007, (R. at 7, 132), alleging disability since December 1, 2004,[2] due to lower back and neck problems, migraines, fibromyalgia, and depression, (R. at 7, 132, 159).  The applications were denied initially, (R. at 7, 59, 71-73), and on reconsideration by a Federal Reviewing Official ("FRO"), (R. at 7, 64-70), and Plaintiff timely requested a hearing before an administrative law judge ("ALJ"), (R. at 7, 84-86).  A hearing was scheduled for October 1, 2008, but was continued in order to obtain more recent medical records.  (R. at 51, 56-57)  The hearing was held on

---

[1] At the February 17, 2009, hearing, asked what grade she actually completed, Plaintiff testified that she "believe[d] it was through the tenth."  (R. at 34)

[2] At the hearing Plaintiff amended her alleged onset date to February 2, 2007.  (R. at 21)

February 17, 2009, at which Plaintiff, represented by counsel, appeared and testified, as did an impartial medical expert, Edward Spindell, M.D. (the "ME"), and an impartial vocational expert, Ronald A. Briere (the "VE").  (R. at 7, 18-50)  On March 10, 2009, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act.  (R. at 7-17)  The Decision Review Board selected Plaintiff's case for review, (R. at 4), but did not complete its review during the allotted time, (R. at 1), thereby rendering the ALJ's decision the final decision of the Commissioner, (id.).  Plaintiff thereafter filed this action for judicial review.

## Issue

The issue for determination is whether the decision of the Commissioner that Plaintiff is not disabled within the meaning of the Act, as amended, is supported by substantial evidence in the record and is free of legal error.

## Standard of Review

Pursuant to the statute governing review, the Court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The Court's role in reviewing the Commissioner's decision is limited.  Brown v. Apfel, 71 F.Supp.2d 28, 30 (D.R.I. 1999).  Although

3

questions of law are reviewed *de novo*, the Commissioner's findings of fact, if supported by substantial evidence in the record,[3] are conclusive.  Id. (citing 42 U.S.C. § 405(g)).  The determination of substantiality is based upon an evaluation of the record as a whole.  Id. (citing Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)("We must uphold the [Commissioner's] findings ... if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.")(second alteration in original)).  The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner.  Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)).  "Indeed, the resolution of conflicts in the evidence is for the Commissioner, not the courts."  Id. at 31 (citing Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)(citing Richardson v. Perales, 402 U.S. 389, 399, 91 S.Ct. 1420, 1426 (1971))).

**Law**

An individual is eligible to receive SSI if she is aged,

---

[3] The Supreme Court has defined substantial evidence as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206 (1938)); see also Brown v. Apfel, 71 F.Supp.2d 28, 30 (D.R.I. 1999)(quoting Richardson v. Perales, 402 U.S. at 401).

blind, or disabled and meets certain income requirements.  See 42 U.S.C. § 1382(a).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ...."  42 U.S.C. 423(d)(1)(A).  A claimant's impairment must be of such severity that she is unable to perform her previous work or any other kind of substantial gainful employment which exists in the national economy.  See 42 U.S.C. § 423(d)(2)(A).  "An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities."[4]  20 C.F.R. § 416.921(a) (2010).  A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 416.929(a)

_____

[4] The regulations describe "basic work activities" as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 416.921(b) (2010).  Examples of these include:

(1)  Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
(2)  Capacities for seeing, hearing, and speaking;
(3)  Understanding, carrying out, and remembering simple instructions;
(4)  Use of judgment;
(5)  Responding appropriately to supervision, co-workers and usual work situations; and
(6)  Dealing with changes in a routine work setting.

Id.

5

(2010).

The Social Security regulations prescribe a five step inquiry for use in determining whether a claimant is disabled. See 20 C.F.R. § 416.920(a) (2010); see also Bowen v. Yuckert, 482 U.S. 137, 140-42, 107 S.Ct. 2287, 2291 (1987); Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).  Pursuant to that scheme, the Commissioner must determine sequentially: (1) whether the claimant is presently engaged in substantial gainful work activity; (2) whether she has a severe impairment; (3) whether her impairment meets or equals one of the Commissioner's listed impairments; (4) whether she is able to perform her past relevant work; and (5) whether she remains capable of performing any work within the economy.  See 20 C.F.R. § 416.920(b)-(g).  The evaluation may be terminated at any step.  See Seavey v. Barnhart, 276 F.3d at 4.  "The applicant has the burden of production and proof at the first four steps of the process.  If the applicant has met her burden at the first four steps, the Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the applicant can still perform."  Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).

## ALJ's Decision

Following the familiar sequential analysis, the ALJ in the instant case made the following findings: that Plaintiff had not

6

engaged in substantial gainful activity since February 2, 2007, the date of her application, (R. at 9); that Plaintiff's degenerative disc disease of the lumbar and cervical spine, right shoulder tendonopathy, and carpal tunnel syndrome ("CTS") constituted severe impairments, (id.); that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, (R. at 13); that Plaintiff retained the residual functional capacity ("RFC") to perform light work, with nonexertional limitations of occasional climbing, crawling, crouching, stooping, kneeling, and balancing, occasional reaching, occasional lateral rotation of the neck thirty degrees, no concentrated exposure to extreme cold or humidity, and no exposure to unprotected heights and dangerous equipment, (id.); that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible, (R. at 14); that Plaintiff was capable of performing her past relevant work as a machine operator, (R. at 16);[5] and that Plaintiff had not been under a disability, as defined in the Act, since February 2, 2007, the date her application was filed, (R. at 17).

_____

[5] Alternatively, the ALJ found that even if Plaintiff could not perform her past relevant work as a machine operator, other jobs existed in the Rhode Island/Southeastern Massachusetts regional economy which Plaintiff was capable of performing.  (R. at 17)

**Errors Claimed**

Plaintiff alleges that substantial evidence does not support: (1) the ALJ's finding that Plaintiff's headache condition is not severe; (2) the ALJ's evaluation of the opinion of Plaintiff's treating neurologist; (3) the ALJ's evaluation of the opinion of Plaintiff's treating surgeon; and (4) the ALJ's credibility finding.  The Court addresses each of Plaintiff's arguments, albeit in different order.

**Discussion**

**I.   The ALJ's evaluation of the opinions of Plaintiff's treating sources**

Plaintiff contends that the ALJ failed to evaluate accurately the opinions of Plaintiff's treating neurologist, Richard L. Cervone, M.D., and surgeon, Adetokunbo A. Oyelese, M.D.[6]  See Plaintiff's Memorandum in Support of Plaintiff's Motion to Reverse the Decision of the Commissioner ("Plaintiff's Mem.") at 9-10.  As a result, in Plaintiff's view, the ALJ's assessment of those opinions is unsupported by substantial evidence.  See id. at 5-6.

Evaluation of opinion evidence is governed by 20 C.F.R. § 416.927.  Section 416.927(d) provides in relevant part that:

---

[6] Although Plaintiff refers to Dr. Oyelese as an orthopedic surgeon, see Plaintiff's Mem. at 6, 9, it is clear from the record that he is a neurosurgeon, (R. at 31, 266, 303-12, 316-30, 367-68, 381-82).

8

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

20 C.F.R. § 416.927(d)(2) (2010); see also Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *2 (S.S.A.)(listing requirements for giving controlling weight to treating source's opinion). In evaluating medical opinions, an ALJ is directed to consider the existence of an examining relationship, the existence of a treating relationship, the length, nature, and extent thereof, the supportability of an opinion, the consistency of an opinion with the record as a whole, the specialization of the source, and any other factors which the claimant brings to the adjudicator's attention. See 20 C.F.R. § 416.927(d)(2)-(6). Section 416.927(e) further provides that:

> Opinions on some issues, such as the examples that follow, are not medical opinions ... but are, instead, opinions on issues reserved to the Commissioner because

9

they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability.

(1) *Opinions that you are disabled.* We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

(2) *Other opinions on issues reserved to the Commissioner.* We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity, or the application of vocational factors, the final responsibility for deciding these issues remains with the Commissioner.

....

20 C.F.R. § 416.927(e) (internal citation omitted); <u>see also</u> <u>Rodriquez v. Sec'y of Health & Human Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981)("[T]he resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [the Commissioner], not for the doctors or for the courts."); <u>cf.</u> SSR 96-5p, 1996 WL 374183, at *2 (S.S.A.)(noting that even "treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance").

The opinions at issue are questionnaires completed by Drs.

10

Cervone and Oyelese in the fall of 2008.   (R. at 433-36, 437-40)

The ALJ summed up Dr. Cervone's assessment as follows:

> Dr. Cervone completed questionnaires in October 2008 at
> which time he opined the claimant was incapable of
> sustained competitive employment on a full-time, ongoing
> basis.   She experienced significant pain and multiple
> side effects from medications.   He found the claimant
> able to sit or stand for 1 hour at a time; walk for 3-4
> hours at a time; lift and carry 10 pounds occasionally;
> occasional pushing and pulling of arm controls and over
> shoulder work with the left arm; and no pushing and
> pulling of arm controls and over shoulder work with the
> right arm; occasional bending, squatting, kneeling; no
> crawling; occasional exposure to temperature extremes,
> dust, fumes, gases; and no exposure to unprotected
> heights, moving machinery, noise and vibrations.

(R. at 12)(internal citation omitted).   As for Dr. Oyelese's

evaluation, the ALJ summarized:

> Dr. Oyelese reported on September 14, 2008[,] that the
> claimant was diagnosed with anterior cervical stenosis,
> spondylosis, and radiculopathy with severe neck and right
> arm pain.   The doctor opined the claimant was totally
> disabled from even sedentary work due to severe symptoms
> including severe pain and fatigue.   Dr. Oyelese found the
> claimant unable to work.   He found her capable of sitting
> 2-3 hours, stand and/or walking 2 hours at one time in an
> occupational setting; no pushing or pulling with arm
> controls; with no lifting or carrying of any weight; no
> bending, squatting, kneeling, crawling; no exposure to
> unprotected heights, moving machinery, noise, vibrations,
> temperature extremes, dust, fumes and gases; no simple
> grasping, reaching, fine manipulation or over shoulder
> work with the right upper extremity; and occasional
> reaching and no over shoulder work with the left upper
> extremity.

(R. at 11-12)(internal citation omitted).

> Evaluating the doctors' opinions, the ALJ stated that:

> The Administrative Law Judge has carefully considered the
> assessments of Dr. Oyelese, Dr. [Leonard F.] Hubbard, Dr.
> Cervone and Erica Penn Villalla [sic], RNP[,] that the

11

claimant was incapable of sustained competitive employment on a full-time, ongoing basis and gives them limited probative weight since they are not supported by a reasonable precise functional assessment which is supported by clinical findings and the other medical evidence of record. It appears those assessments are based upon the subjective complaints of the claimant more than objective clinical findings. Dr. Spindell testified that Dr. Cervone's October 2008 residual functional capacity statement limited the claimant to a less than sedentary range of functioning, yet reported the claimant was able to walk for 3-4 hours at one time. He further testified that there was no objective evidence to support Dr. Cervone's assessment that the claimant was only able to sit or stand for 1 hour at a time, nor Erica Penn Villalla [sic], RNP's assessment that the claimant was unable to stand or walk at all, and that the claimant could never be exposed to extremes of temperature, fumes and gases. Dr. Spindell testified that in spite of Dr. Hubbard's diagnosis of impingement, he reported the claimant had a full range of motion of the right shoulder.

In response to questioning in September 2008 of how many hours the claimant could work, Dr. Oyelese opined ... "zero" hours. But in seeming contradiction, when asked on the same form, as to how long the claimant could sit, stand and walk at one time in an occupational setting, Dr. Oyelese reported she was capable of sitting 2-3 hours and standing and/or walking 2 hours in an occupational setting. Furthermore, Dr. Cervone reported in October 2008 that the claimant was only capable of sitting 1 hour at a time; Erica Penn Villalla [sic], RNP reported in February 2009 that the claimant was only capable of sitting 1 hour; and at the hearing the claimant testified she was able to sit 15-20 minutes, yet the hearing lasted approximately 1½ hours and the claimant never alleged any difficulty sitting and the Administrative Law Judge did not observe the claimant to be in discomfort.

(R. at 16)(internal citations omitted).

As an initial matter, the Court makes two observations.

First, it is clear that the ALJ was not required to accept the opinions of Plaintiff's treating sources regarding the ultimate

issue of whether Plaintiff is disabled.  See 20 C.F.R. §

416.927(e); see also Rodriquez, 647 F.2d at 222; SSR 96-5p, 1996

WL 374183, at *2.  Second, the Court of Appeals for the First

Circuit has "held that the testimony of a non-examining medical

advisor ... can alone constitute substantial evidence, depending

on the circumstances."  Berrios Lopez v. Sec'y of Health & Human

Servs., 951 F.2d 427, 431 (1st Cir. 1991); see also Rodriquez v.

Sec'y of Health & Human Servs., 893 F.2d 401, 403 (1st Cir. 1989)

(noting that "whether the testimony of a medical advisor who

reviews the record and testifies at the hearing can itself alone

constitute substantial evidence varies with the circumstances,

including the nature of the illness and the information provided

to the advisor")(quoting Torres v. Sec'y of Health & Human

Servs., 870 F.2d 742, 744 (1st Cir. 1989)[7]); Guzman Diaz v. Sec'y

---

[7] In Torres, in allowing a medical expert's testimony to
constitute substantial evidence, the First Circuit stated that:

> First, the medical advisor in this case did, in fact, testify
> and was subject to cross-examination.  Second, we have stated
> that whether the testimony of a medical advisor who reviews
> the record and testifies at the hearing can itself alone
> constitute substantial evidence varies with the circumstances,
> including the nature of the illness and the information
> provided to the advisor.  Third, it is evident that the
> Secretary's finding of nondisability was not based solely on
> the medical advisor's testimony.  Fourth, and perhaps most
> significantly, the opinion of the medical advisor was
> completely consistent with the opinions of the examining
> physicians.

870 F.2d at 744 (internal citation omitted).  Here, by contrast, the
ALJ appears to have relied exclusively on the ME's testimony, and the
ME's testimony was not consistent with the opinions of the treating
and examining sources.

of Health & Human Servs., 613 F.2d 1194, 1199 n.7 (1st Cir. 1980)
(noting that whether testimony of medical expert who had never
examined claimant, but only reviewed medical records, could
constitute substantial evidence on the record as a whole
supporting Secretary's denial of disability benefits "will
doubtlessly vary with the circumstances, including the nature of
the illness and the information provided to the expert").

In affording the opinions of Drs. Cervone and Oyelese
limited probative weight, it appears that the ALJ did not find
them to be supported by precise functional assessments buttressed
by objective clinical findings and other medical evidence of
record but, rather, based upon the subjective complaints of the
claimant; internally inconsistent, according to the ME's
testimony; and incompatible with the ALJ's personal observations.
(R. at 16)  These would be valid reasons if they were borne out
by the record.  Here, they are not.

First, Dr. Cervone and Dr. Oyelese each completed a Physical
Capacity Evaluation, a Medical Questionnaire, and a Pain
Questionnaire.[8]  (R. at 433-40)  The Physical Capacity
Evaluations contain specific findings regarding Plaintiff's
functional capabilities.  (R. at 435, 438)  They must be read in
conjunction with the Medical and Pain Questionnaires, which

_____

[8] Although the third document completed by Dr. Oyelese is not
entitled "Pain Questionnaire," (R. at 436), the questions presented
closely resemble those included on the Pain Questionnaire completed by
Dr. Cervone, (R. at 439), and the Court treats it as such.

14

provide information regarding Plaintiff's diagnoses, symptoms, pain, severity, and supporting objective clinical findings. (R. at 433-34, 436-40) For example, Dr. Cervone listed Plaintiff's diagnoses as cervical disc herniations/cervical disc syndrome with right cervical radiculopathies, as well as moderate to severe tension and migraine headaches. (R. at 437, 439) He further noted that Plaintiff had undergone two cervical spine surgeries. (R. at 437) Dr. Oyelese, who performed those operations, indicated a diagnosis of cervical radiculopathy with chronic pain. (R. at 433, 436) Both doctors stated that Plaintiff suffered from significant pain, caused by a medically determinable impairment which was diagnosed by objective signs and/or laboratory findings, namely MRI, CT scan, and EMG testing. (R. at 436, 439) The doctors indicated that Plaintiff's symptoms were neck pain, right shoulder pain, and right arm pain.[9] (R. at 433, 437) They rated her symptoms as at least moderate to severe. (R. at 433, 437) Both additionally indicated that Plaintiff's impairments could reasonably be expected to cause such pain, (R. at 436, 439), and would significantly impair her ability to perform basic work activities, (R. at 433, 437, 439).

As for the ALJ's finding that the assessments of Dr. Cervone and Dr. Oyelese appear to be "based upon the subjective

---

[9] Dr. Cervone additionally listed headaches among Plaintiff's symptoms. (R. at 437)

complaints of the claimant ...," (R. at 16), the ALJ seems to have overlooked the fact that each physician had treated Plaintiff for over three years, (R. at 433, 437); see also 20 C.F.R. § 416.927(d)(2). Over that time, based on the evidence in the record, Plaintiff saw Dr. Cervone, her neurologist, at least seven times, (R. at 262-74, 441), and Dr. Oyelese, her neurosurgeon, approximately thirteen times, (R. at 304-28, 428-32). Dr. Cervone prescribed a variety of medications for Plaintiff, including extra strength Vicodin, Flexeril, Elavil, Cymbalta, Zomig nasal spray, and Ambien. (R. at 265, 266, 268-69, 271) Dr. Cervone also referred Plaintiff to a neurosurgeon (Dr. Oyelese) for consultation, (R. at 264-66), who, in turn, referred her to a pain clinic, (R. at 266-67), and, ultimately, when conservative treatment failed, (R. at 266, 304, 329), performed two cervical spine surgeries, (R. at 259-60, 314-15). These are not the actions of medical professionals who relied solely on the "subjective complaints of the claimant ...," (R. at 16).

Second, with regard to the inconsistencies in the opinions of Drs. Cervone and Oyelese noted by the ME, (R. at 16, 31, 43-45), the Court agrees that these supposed inconsistencies are not incompatible with the doctors' findings that Plaintiff was unable to work, see Plaintiff's Mem. at 9. Both inconsistencies focused on Plaintiff's ability to sit, stand, or walk. (R. at 16)

16

However, one must consider the nature of Plaintiff's impairments. The ALJ found Plaintiff's degenerative disc disease of the lumbar and cervical spine, right shoulder tendonopathy, and CTS to be severe impairments. (R. at 9)  While, arguably, Plaintiff's degenerative lumbar disc disease could affect her ability to sit for 1-3 hours at a time and walk for 2-4 hours at a time, (R. at 12), the rest of Plaintiff's severe impairments involved her cervical spine, right shoulder, and hands/wrists, (R. at 9), none of which would necessarily affect Plaintiff's ability to sit, stand, and/or walk.  In response to a question from her attorney regarding her two unsuccessful work attempts, Plaintiff testified that she had difficulty with the movement.  (R. at 37)  Asked what she had to move in her body that was too painful for her, Plaintiff responded "[f]rom the waist up, I think everything ...," (id.), especially her arms, (id.).

    Third, the ALJ's statement that "the hearing lasted approximately 1½ hours and the claimant never alleged any difficulty sitting and the Administrative Law Judge did not observe the claimant to be in discomfort," (R. at 16), is a valid consideration, see SSR 96-7p, 1996 WL 374186, at *5 (S.S.A.)("In instances where the individual attends an administrative proceeding conducted by the adjudicator, the adjudicator may also consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the

17

individual's statements."). However, the Court cannot overlook the fact that every treating source who provided an assessment of Plaintiff's functioning found Plaintiff's symptoms to be at least moderate to severe, (R. at 300, 433, 437, 467), stated that her symptoms resulted from medically determinable impairments, (R. at 303, 436, 439), noted that these impairments were verified by objective medical findings, (R. at 303, 436, 439), and opined that the impairments would significantly limit Plaintiff's ability to perform basic work activities, (R. at 300, 433, 437, 467). In addition to the aforementioned assessments of Drs. Cervone and Oyelese, Plaintiff's primary care physician, Emilio Rodriguez-Peris, M.D., and treating nurse practitioner, Erika Penn Villella, RNP, submitted Physical Capacity Evaluations, Medical Questionnaires, and what appears to be a joint Pain Questionnaire.[10]  (R. at 300-03, 467-69)  In addition, Dr. Hubbard, who performed a shoulder acromioplasty[11] on Plaintiff, (R. at 464), on January 16, 2009, stated that Plaintiff "remains disabled for any significant employment involving the use of her right hand."  (R. at 450)

Although it is the ALJ's responsibility to resolve conflicts

---

[10]  See n.8.

[11]  Dr. Hubbard diagnosed Plaintiff with right shoulder impingement.  (R. at 31, 466)  While the ALJ and ME focused on the fact that, post-surgery, Dr. Hubbard's notes reflect that Plaintiff exhibited good range of motion, (R. at 16, 31, 43), Dr. Hubbard also continued to record that impingement was present, (R. at 43, 425-26, 462, 463, 465, 466).

in the evidence, see Evangelista v. Sec'y of Health & Human
Servs., 826 F.2d 136, 141 (1st Cir. 1987)("Conflicts in the
evidence are, assuredly, for the [Commissioner]-rather than the
courts-to decide."); Rodriguez, 647 F.2d at 222, in the
circumstances of this case there is simply too much contrary
evidence from Plaintiff's treating sources to allow the ME's
testimony alone to constitute substantial evidence in support of
the ALJ's RFC assessment,[12] see Berrios Lopez, 951 F.2d at 431;
Rodriguez, 893 F.2d at 403; Guzman Diaz, 613 F.2d at 1199 n.7.
Moreover, the ALJ appears not to have taken into consideration
the length and extent of Plaintiff's treating relationship with
Drs. Cervone and Oyelese, nor does the fact that these doctors
are specialists appear to have been considered fully.
Accordingly, I recommend that the matter be remanded for further
consideration of the opinions of Drs. Cervone and Oyelese in
accordance with the factors listed in 20 C.F.R. § 416.927(d).

## II.  The ALJ's assessment of Plaintiff's migraine headaches

Plaintiff argues that the ALJ ruled that Plaintiff's
migraine headache condition was nonsevere and that substantial
evidence does not support this finding.  Plaintiff's Mem. at 6.
Plaintiff premises her argument on the fact that her neurologist,

---

[12] Although the ALJ did not expressly rely on the assessments of
the nonexamining, reviewing medical sources, she did question the ME
at the hearing regarding the reasonableness of the opinions of Edward
Hanna, M.D., (R. at 32-33); see also (R. at 275-82).

Dr. Cervone, found her headaches to be "[m]ore-than-[m]inimal," id. at 7, and the contention that the ALJ's finding of improvement in Plaintiff's condition was not a basis for a determination that her headaches were not severe, id. at 7-8. The Court agrees that the ALJ's implicit[13] finding with regard to Plaintiff's migraine headaches is unsupported by substantial evidence.

"To be found disabled, an individual must have a medically determinable 'severe' physical or mental impairment or combination of impairments that meets the duration requirement." SSR 96-3p, 1996 WL 374181, at *1 (S.S.A.). "At step 2 of the sequential evaluation process, an impairment or combination of impairments is considered 'severe' if it significantly limits an individual's physical or mental abilities to do basic work activities ...." Id. The First Circuit has stated that the step two severity determination is a *de minimis* policy, designed to do no more than screen out groundless claims." McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1124 (1st Cir. 1986); see also Lisi v. Apfel, 111 F.Supp.2d 103, 110 (D.R.I. 2000) (citing McDonald, 795 F.2d at 1124). A finding of "nonsevere" is only to be made where "medical evidence establishes only a slight

---

[13] The ALJ did not explicitly "rule[]," Plaintiff's Mem. at 6, that Plaintiff's migraine headaches were nonsevere. However, the ALJ did not list Plaintiff's migraines among the impairments found to be severe. (R. at 9)

abnormality or combination of slight abnormalities which would
have no more than a minimal effect on an individual's ability to
work ...."  McDonald, 795 F.2d at 1124 (quoting SSR 85-28, 1985
WL 56856, at *3 (S.S.A.)); see also SSR 96-3p, 1996 WL 374181, at
*1 (same); SSR 85-28, 1985 WL 56856, at *2 ("[T]he severity
regulation is to do no more than allow the [Commissioner] to deny
benefits summarily to those applicants with impairments of a
minimal nature which could never prevent a person from
working.")(internal quotation marks omitted).  "Great care should
be exercised in applying the not severe impairment concept."  SSR
85-28, 1985 WL 56856, at *4; see also Munoz v. Sec'y of Health &
Human Servs., 788 F.2d 822, 823 (1st Cir. 1986).

       The ALJ noted Plaintiff's headache condition several times
in the decision.  (R. at 9, 10, 11, 12, 13, 14-15)  The ALJ
ultimately concluded, however, that:

> The claimant alleges disability due to headaches and the
> record does establish she received treatment for such,
> but there is no evidence that th[e] claimant experienced
> a significant impairment in functioning due to headaches.
> Dr. Cervone reported in April 2007 that the claimant's
> headaches were doing much better after switching from
> prescribed Zomig tablets to Zomig nasal spray.   Dr.
> [Keith R.] Brecher noted the claimant's headaches were
> without auras, that they were sporadic and responded to
> either Treximet or Zomig NS[,] and that the frequency of
> the  claimant's  headaches  did  not  warrant  use  of  a
> preventative drug.

(R. at 15)(internal citations omitted).

       The evidence pertaining to Plaintiff's migraines is not
insubstantial.  The record is replete with consistent complaints

21

of headaches.  (R. at 196, 197, 240, 242, 243, 247, 262, 266, 267, 268, 271, 273, 286, 288, 296, 299, 360, 367, 381, 392, 393, 396, 397, 404, 409, 428, 448, 453, 454, 461)  Plaintiff's neurologist, Dr. Cervone, noted on April 6, 2005, that, in addition to Plaintiff's cervical spine pain,

> she had developed the onset of migraine headaches. She had seen a Neurologist in the past for these migraines and she has tried various medications including abortive agents as well as prophylaxis agents.  She has been trialed on Imitrex nasal spray and this was changed to 2.5 mg which was eventually change[d] to 5 mg.  She also received a local injection to her occipital muscles before by Dr. Bernal, Neurologist[,] for her severe posterior head pain.  She has also had significant difficulties with her sleep and difficulties finding a comfortable position secondary to her back and head pain. ...  She is currently on Zomig at 5 mg per dose and she is taking on average of two pills per day chronically for the last several years.
>
> The typical migraines are usually occipital in location occurring on both the right [and] left sides with the right being much worse than the left.  There seems to be an association with her right sided neck and shoulder pain.  That is, when these symptoms worsened, her headaches worsen.  She also has pleuritis of vision, photophobia, throbbing and pounding and some nausea with dry heaves at times.  She has never had vertigo, hemisensory deficit, hemiparesis or other neurological deficit such as visual loss or otherwise at any time in the past.

(R. at 262)  Regarding a March 22, 2006, MRI of Plaintiff's brain, which was otherwise normal, (R. at 258), Dr. Cervone wrote that "[t]here was a single focus of increased T2 signal intensity [area] 3 mm in size within the high left frontal subcortical white matter which could have been possibly explained by a small focus of encephalomalacia versus a white matter lesion.  However,

she does have migraines and this could also explain this," (R. at 267). Dr. Rodriguez-Peris noted on January 30, 2007, that Plaintiff had a medical history of severe migraines; that she had been on Zomig, Frova, Fioricet, Cafergot, Calan Sr, Inderol 80 mg, Imitrex, Axert, and Elavil, but none of these medications helped her headaches; and that she continued to suffer with headaches as of that date. (R. at 297) Thus, Plaintiff has met her burden of providing evidence regarding her migraines. See Freeman v. Barnhart, 274 F.3d 606, 609 (1st Cir. 2001)(noting Plaintiff's burden of production and proof at the first four steps of the sequential evaluation); 20 C.F.R. § 416.912(a) (2010).

The ALJ focused on Dr. Cervone's April 23, 2007, progress note in which he stated that Plaintiff was doing much better on the new medication formulation, (R. at 273), as well as Dr. Brecher's December 19, 2008, assessment that Plaintiff's migraines were sporadic, responded to medication, and did not warrant use of a preventative drug, (R. at 449). However, the state agency neurologist who reviewed the record at the FRO level, M.S. Miller, M.D., found that while "[h]eadache severity is poorly defined [and] [f]requency and duration are not reported," (R. at 340), "Dr. Cervone state[d] the claimant used Zomig every day and had failed multiple prophylactic medications. Although there is insufficient data to support the headache

impairment equalling or meeting a listing, the headaches are severe," (id.).

Further, Plaintiff continued to complain of headaches to her primary care physician after the statements by Drs. Cervone and Brecher which the ALJ quoted.  For example, on November 24, 2008, Dr. Rodriguez-Peris indicated that Plaintiff had headaches daily and that only Zomig nasal spray provided any relief.  (R. at 454) On December 17, 2008, he noted the presence of migraines, treated with Zomig nasal spray and Treximet.  (R. at 453)  Migraines are also listed on Dr. Rodriguez-Peris' office notes of January 20, 2009.  (R. at 461)  Yet, the ALJ included no limitations based on Plaintiff's headaches in the RFC assessment.

In addition, Plaintiff testified that she continued to suffer from migraines which "come randomly," (R. at 34), approximately three times per week, (R. at 38), and for which she took medication which made her "very drowsy," (R. at 34); see also (R. at 38)(noting that the day before the hearing Plaintiff had a migraine which failed to respond to the first pill, so she "had to take a second pill and that knocks you down and you can't get up").  Plaintiff's report of drowsiness is confirmed by Dr. Rodriguez-Peris, who listed sedation and irritability as side effects of Plaintiff's medications, and by Erika Penn Villella, who enumerated nausea, fatigue, and drowsiness as Plaintiff's side effects, (R. at 468).

24

The Court recognizes that the ALJ was not bound by the opinion of the state agency reviewing physician that Plaintiff's migraine headaches were severe, see 20 C.F.R. § 416.927(f)(2)(i) ("Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists."); SSR 96-6p, 1996 WL 374180, at *2 (S.S.A.)(same), and that it is the ALJ's responsibility to resolve conflicts in the evidence, see Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)("[T]he resolution of conflicts in the evidence is for the [Comissioner], not the courts.")(citing Rodriguez, 647 F.2d at 222); Evangelista, 826 F.2d at 141.  However, particularly as step two is intended to require a minimal showing, the ALJ at least should have explained her reasoning for discounting Dr. Miller's opinion regarding the severity of Plaintiff's migraine headaches.  See SSR 96-6p, 1996 WL 374180, at *2 ("Administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions.).

Based on the foregoing it is clear that the ALJ could not reasonably have found in this case that Plaintiff's headaches posed no more than a "*de minimis*" condition having no more than a minimal effect on Plaintiff's ability to work.  See McDonald, 795

25

F.2d at 1124; SSR 96-3p, 1996 WL 374181, at *1; SSR 85-28, 1985

WL 56856, at *3; cf. Irlanda Ortiz, 955 F.2d at 769 ("We must

uphold the [Commissioner's] findings if a reasonable mind,

reviewing the evidence in the record as a whole, could accept it

as adequate to support his conclusion.")(quoting Rodriguez, 647

F.2d at 222).  This is particularly so given the VE's testimony

that if an individual had to lie down for even one hour per day

work would be precluded.  (R. at 48)

It is true, as Defendant notes, see Defendant's Memorandum

of Law in Support of Motion for an Order Affirming the Decision

of the Commissioner ("Defendant's Mem.") at 7-8, that Dr.

Cervone's assessment did not focus on Plaintiff's headaches alone

but, rather, on her condition in its entirety.  (R. at 437, 439-

40)  However, based on his office notes, it is apparent that he

viewed her impairments as related.  Dr. Cervone observed that:

> I believe her cervical spine symptoms are also creating
> chronic pain, anxiety and stress which have[,] in turn,
> fueled her migraines to make them much worse as well. I
> believe she is in a vicious cycle which can only be
> broken/solved by getting her cervical spine condition
> treated and much better.

(R. at 264); see also (R. at 268)("I do believe that she is

having a degree of masked depression as well as anxiety

presenting as extreme fatigue and increased levels [of] pain

presenting as migraines ....").  Thus, the Court is unable to

find that substantial evidence supports the ALJ's implicit

determination that Plaintiff's headaches have no more than a

26

minimal effect on her ability to work.

Defendant further argues that "[e]ven if it could be said
... that the ALJ had erred, any such error would be harmless,"
Defendant's Mem. at 8, because "the ALJ did not terminate the
sequential evaluation process at step two for lack of a severe
impairment.  Rather, he went on to process the claim through the
remaining steps of the sequential evaluation process," id.
(internal citations omitted).  While Defendant's point that "when
an ALJ finds one severe impairment, all impairments, both severe
and nonsevere, are considered in assessing a claimant's RFC," id.
(citing 20 C.F.R. §§ 416.920(e), 416.925(a)(2); SSR 96-8p), is
valid, in the circumstances of this case the Court cannot agree
that "the question of whether the ALJ characterized any other
alleged impairment as severe or not severe is of little
consequence," id. (quoting Pompa v. Comm'r of Soc. Sec., No. 02-
2335, 2003 WL 21949797, at *1 (6th Cir. Aug. 11, 2003)).  Because
the ALJ included no limitations in her assessment of Plaintiff's
RFC stemming from Plaintiff's migraine headaches, (R. at 13), it
is impossible to gauge what impact a finding of severity would
have had on that RFC determination, particularly in terms of any
limitations in Plaintiff's ability to concentrate and/or complete
an entire workday.  Thus, because a different outcome at step two
with respect to Plaintiff's headaches may have affected the ALJ's
overall RFC determination and possibly the outcome of the case,

cf. Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989)(finding no need "to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."); Seymour v. Barnhart, No. 02-197-B-W, 2003 WL 22466174, at *3 (D. Me. Oct. 31, 2003)("[A]n arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where ... the deficiency probably ha[s] no practical effect on the outcome of the case.") (quoting Bryant ex rel. Bryant v. Apfel, 141 F.3d 1249, 1252 (8th Cir. 1998))(second and third alterations in original), the Court cannot find that the ALJ's failure to find Plaintiff's migraine headaches severe is harmless error.  I therefore recommend that the matter be remanded for explicit consideration of the severity of Plaintiff's migraine headache condition.

## III.  The ALJ's credibility finding

Lastly, Plaintiff contends that the ALJ's credibility finding is not supported by substantial evidence.  See Plaintiff's Mem. at 10.  Plaintiff specifically focuses on her own testimony, which the ALJ found was inconsistent with an inability to work.  See Plaintiff's Mem. at 10-11.

An ALJ is required to investigate "all avenues presented that relate to subjective complaints ...."  Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 28 (1st Cir. 1986).  In addition, "whenever the individual's statements about the

28

intensity, persistence, or functionally limiting effects of pain

or other symptoms are not substantiated by objective medical

evidence, the adjudicator must make a finding on the credibility

of the individual's statements based on a consideration of the

entire case record."  SSR 96-7p, 1996 WL 374186, at *2.  When

assessing the credibility of an individual's statements, the ALJ

must consider, in addition to the objective medical evidence, the

following factors:

1.  The individual's daily activities;
2.  The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3.  Factors that precipitate and aggravate the symptoms;
4.  The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5.  Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6.  Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7.  Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3; <u>see also</u> <u>Avery</u>, 797 F.2d at 29

(listing factors relevant to symptoms, such as pain, to be

considered); 20 C.F.R. § 416.929(c)(3) (2010) (same).  The ALJ's

credibility finding is generally entitled to deference,

especially when supported by specific findings.  <u>Frustaglia v.</u>

<u>Sec'y of Health & Human Servs.</u>, 829 F.2d 192, 195 (1st Cir. 1987)

(citing <u>DaRosa v. Sec'y of Health & Human Servs.</u>, 803 F.2d 24, 26

(1st Cir. 1986)); see also Yongo v. INS, 355 F.3d 27, 32 (1st Cir.

2004)("[T]he ALJ, like any fact-finder who hears the witnesses,

gets a lot of deference on credibility judgments."); Suarez v.

Sec'y of Health & Human Servs., 740 F.2d 1 (1st Cir. 1984)

(stating that ALJ is "empowered to make credibility

determinations ..."); cf. Becker v. Sec'y of Health & Human

Servs., 895 F.2d 34, 36 (1st Cir. 1990)("A reviewing court must

treat the agency's factual conclusion with considerable respect

....").

The ALJ found that Plaintiff's medically determinable

impairments could reasonably be expected to cause her alleged

symptoms, but that her "statements concerning the intensity,

persistence and limiting effects of these symptoms are not

entirely credible." (R. at 14)  The ALJ elaborated that:

> The alleged limitations in sitting, standing, walking,
> using the hands, lifting, carrying, attention,
> concentration, focusing, and memory are not substantiated
> by competent medical evidence to the degree alleged.  The
> alleged frequency, severity and duration of the
> claimant's pain is not supported by the weight of the
> medical evidence to the degree alleged.

(Id.)  Explaining her finding, the ALJ continued:

> Although the claimant has limitations secondary to her
> impairments, they are not of the severity she alleges.
> In a Function Report completed April 16, 2005[,] the
> claimant reported that she got up and got her three
> children ready and off to school, then would pick up
> around the house a little.  She reported she took care of
> the children.  She reported no problems performing
> personal hygiene and grooming.  She prepared meals on a
> daily basis.  The claimant stated she was able to drive,
> able to go out alone, and that she shopped and attended

30

church.    She  had  no  difficulty  handling  household
finances.    She  read  and  watched  television  on  a  daily
basis.    The  claimant  reported  she  did  things  on  the
weekends  without  accompaniment,  and  others  came  to  visit
her.    At  the  hearing  the  claimant  testified  that  on  a
daily  basis  she  got  up,  took  a  shower  and  made  something
to  eat.    She  stated  she  would  lay  [sic]  down  until  her
children  came  home  from  school  and  then  would  spend  time
with  the  children  after  school,  including  helping  the
youngest  with  his  reading  homework.    She  watched  the  news
on  television  and  read  when  she  didn't  have  a  headache.
She  was  able  to  drive,  and  went  grocery  shopping  with  her
husband.    She  alleged  no  difficulty  handling  money  or
household  finances.    The  claimant  stated  she  had
difficulty  walking  due  to  body  aches  and  in  response  to
questioning  by  the  Administrative  Law  Judge  as  to  how
long  she  was  able  to  walk,  the  claimant  stated  she  had  no
idea.    The  claimant  testified  that  she  could  only  sit
comfortably  15-20  minutes.

Although  the  claimant  has  limitations  secondary  to  her
physical  and  emotional  impairments,  they  are  not  of  the
severity  she  alleges.    Except  for  a  little  assistance
with  her  hair,  the  claimant  is  able  to  perform  personal
hygiene  and  grooming.    She  testified  that  she  prepared
meals,  grocery  shopped,  and  drove  a  car.    She  alleged  no
difficulty  in  handling  household  finances.    She  helped
her  youngest  child  with  homework.    Her  description  of
daily  activities  is  consistent  with  a  person  who  lives
independently  and  adequately  maintains  a  household.

(R. at 14-15)

It is clear from the foregoing passage that the ALJ based

her credibility finding almost exclusively on Plaintiff's daily

activities.  While the ALJ questioned Plaintiff at the hearing

regarding other factors, (R. at 22-30, 32-36), the ALJ appears to

have given them little consideration.  The Court is particularly

troubled by the lack of attention paid to Plaintiff's testimony

regarding the side effects of her medications and functional

limitations.

31

Plaintiff testified that she took Percocet, Motrin, amitryptiline, and Zomig.  (R. at 24, 39)  As noted previously, Plaintiff stated that her headache medication made her "very drowsy."  (R. at 34)  Plaintiff further testified that the amitryptiline she was taking for fibromyalgia made it difficult for her to get up in the morning and that it, too, made her "very drowsy."  (R. at 25)  The ALJ subsequently returned to the subject of Plaintiff's medications:

> Q    Okay.  Now, you mentioned that when you take the amitrypt[i]line, it makes it difficult in the morning.  Aside from that, are there any other side effects from your medications?
>
> A    The Percocet, when I take it when I have, you know, severe pain, chronic pain, I take it and definitely I can't get up because it's very strong.
>
> Q    Okay, so it makes you drowsy?
>
> A    Yes.
>
> Q    And how often do you take the -- it says as needed.
>
> A    As needed.
>
> Q    Okay. And on average, how often do you need the Percocet?
>
> A    I would say probably twice a day.

(R. at 26)  This testimony is not mentioned in the ALJ's explanation of her credibility finding.  If the ALJ accepted Plaintiff's testimony as true, she should have accounted for it in her RFC assessment, finding at least a moderate limitation in Plaintiff's ability to concentrate.  The VE testified that if a

hypothetical individual of Plaintiff's age, education, and RFC had a moderate limitation in sustaining concentration, persistence, and pace, she would be able to perform a number of occupations, but if the limitation were moderately severe the occupations listed, as well as Plaintiff's past relevant work, would be precluded.  (R. at 48)

Plaintiff also testified as to how much time she spends lying down during a typical day:

> Q    Ma'am, take me through a typical day when you don't have a medical appointment.
>
> A    Basically I just get up and have coffee and then sit down again, watch the news.  If I'm up to it, I'll take a shower ...; if not, then I'll just wait a couple of more hours and then I'll take my shower and then just take something quick, you know, eat something light and just lay down and just wait for my kids to get home.

(R. at 33)  In response to a question from her attorney regarding what percentage of the day she spent lying down, Plaintiff responded "I'd say half a day."  (R. at 38)  The ALJ apparently accepted this testimony, but it warranted only a brief mention in the her decision.  (R. at 14)(noting that Plaintiff "stated she would lay down until her children came home from school").  The ALJ gave no reason for disbelieving Plaintiff's statements.  The Court again notes that the VE stated that if a person had to lie down for an hour a day, and that need could not be accommodated with usual breaks, work would be precluded.  (R. at 48)

Moreover, the ALJ appears to have overstated Plaintiff's

33

hearing testimony.  The ALJ stated that "[e]xcept for a little assistance with her hair, the claimant is able to perform personal hygiene and grooming."  (R. at 15)  Plaintiff's testimony reflects that she also had difficulty dressing.  (R. at 28)(stating that "[e]specially if [she was] going to put [her] bra on" she could not do it and needed help).  The ALJ wrote that Plaintiff "testified that she prepared meals, grocery shopped, and drove a car."  (R. at 15)  Plaintiff's actual testimony is somewhat different:

> Q   [W]hen you filled out the paperwork for Social Security, you indicated at that time you cared for your children, you prepared some meals and you drove and shopped.  Can you still do those items?
>
> A   Not all of them.
>
> Q   Okay.  What limits you?  Caring for your children, any problems?
>
> A   I have a lot of help with my daughter, my oldest daughter, with them and I try to teach them how to do their own things so basically I don't -- they get dressed themselves and with the meals, I have a lot of help with my daughter.  When she comes from school, I tell her what to do.  And then when my husband comes at five, he finishes with her.
>
> Q   What aspects of making a meal are difficult for you?
>
> A   It's just basically the movement of my right hand, if I move it too often, then I'm getting a lot of pain and it goes down.  It comes down from my neck to my arm, so it starts hurting a lot, so that's why I'm not able to do it as I did it before.
>
> Q   Do you still drive?
>
> A   I do drive, but not as I did before, no.

34

Q     Where does that hurt you?

A     Just basically moving the wheel ....

Q     Are you able to shop for food?

A     No, I go with my husband.[14]

(R. at 28-29)  Finally, as to the statement that Plaintiff "helped her youngest child with homework," (R. at 15), that "help" consisted of listening to him read to her while she was in her bed, (R. at 36).  According to Plaintiff, her oldest daughter helped him with the rest of his homework.  (Id.)

In addition, at the February 17, 2009, hearing the ALJ only briefly questioned Plaintiff regarding her CTS, an impairment which the ALJ found to be severe,[15] (R. at 9).  She asked about Plaintiff's two unsuccessful work attempts, (R. at 22), then asked why Plaintiff felt she could not work, to which Plaintiff responded:

A     Because I'm in constant pain especially on, you
      know, all my joints and especially my right hand
      and shoulder.  It's not -- I had surgery on it and

---

[14] The Court notes that the ALJ stated previously that Plaintiff shopped with her husband.  (R. at 15)

[15] Curiously, although the ALJ found Plaintiff's CTS to be a severe impairment, the ALJ stated in her opinion that:

The record shows the claimant was diagnosed with carpal tunnel syndrome.  August 2008 EMG results showed mild to moderate right carpal tunnel syndrome.  The record showed no physical examination of the claimant's hands within the last year, and there is no indication in the evidence of record that it will last 12 continuous months.

(R. at 15)

I haven't been feeling well since that.

(R. at 22)   After reviewing Plaintiff's surgical history, the ALJ asked which of Plaintiff's problems she considered the worst:

    A    It's my neck and my shoulder, my hand, the whole
         shoulder, the whole hand.

    Q    And is it both sides or --

    A    Especially it's on my right.   Like I have chronic
         pain like all over, but especially it's on my right
         shoulder --

    Q    Okay.

    A    -- my neck.

    Q    How -- and are you left or right handed?

    A    Right handed.

(R. at 24)   Plaintiff further testified that the pain was constant and was only relieved by her medications, including Percocet and Motrin, for a couple of hours.   (R. at 24-25)

In response to a question from the ALJ, the ME testified that Plaintiff's CTS was supported by the record.   (R. at 39) However, the ALJ included no limitations from Plaintiff's CTS in the RFC determination.[16]   (R. at 13)   The ALJ noted that there

---

[16] As the ALJ added restrictions to her hypothetical questions to the VE, including occasional use of the hands for grasping, gripping, and twisting, the VE responded that the restrictions would not change his answer.   (R. at 46-48)   Asked by Plaintiff's counsel whether his answer would change if the hypothetical worker were limited to no more than occasional use of the dominant hand for fine manipulation, the VE replied that it would and that the occupations he had listed at the light and sedentary levels would be precluded.   This testimony is consistent with Dr. Hubbard's aforementioned opinion that Plaintiff was unable to perform any significant employment involving the use of her right hand.   (R. at 450)

had been no treatment for CTS between 2001 and the EMG testing in
2008, (R. at 39), and that there had been no hand examination in
the past year, (R. at 39-42).  When asked if there had been some
recurrence of problems with her hands, Plaintiff testified
that:

> A    Yes.  When they did an EMG on me before the
>      shoulder surgery, they did find out that it showed
>      that I -- the carpal tunnel came back on my right
>      hand.
>
> Q    And what are they suggesting for treatment?
>
> A    He's basically right now treating me for my
>      shoulder because I have a lot of pain, but then
>      he's asking me what symptoms am I having now with
>      my right hand, so I tell him that I'm getting
>      numbness again and so he -- I have to go back to
>      him in I think it's the end of this month.
>
> Q    Now, is that [Cervone]?
>
> A    No, Dr. Hubbard.

(R. at 27)

The ALJ additionally noted Plaintiff's alleged failure to
follow up on recommended treatment. (R. at 15)("It is certainly
reasonable to assume that if the claimant followed through with
her doctor's recommendations for treatment, she would experience
an improvement in her condition and an increase in functional
ability.").  While this is a proper factor for the ALJ to
consider, see Irlanda Ortiz, 955 F.2d at 770 ("[I]mplicit in a
finding of disability is a determination that existing treatment
alternatives would not restore a claimant's ability to work."),

the evidence on this point is far from clear.  The ALJ stated that:

> Dr. Cervone noted as early as June 2005 that he referred the claimant to a pain management clinic and possible epidural steroid injections, but that the claimant was not interested and was prescribed medication; Dr. Oyelese referred the claimant to a pain management clinic in May 2007 but noted in October 2007 that the claimant did not follow through with recommendations to get injections from Dr. [Pradeep] Choppra [sic] at the pain management clinic; and Dr. Brecher reported on December 19, 2008[,] the claimant was not interested in participating in the fibromyalgia treatment plan, but was interested in medication.

(R. at 15)(internal citations omitted).  Dr. Cervone's office note of June 2, 2005, reflects that it was actually Dr. Oyelese who referred Plaintiff to Dr. Chopra, (R. at 266), and Dr. Cervone's April 18, 2006, note states that Plaintiff "has been seeing Dr. Pradeep Chopra at his pain clinic," (R. at 267).  Dr. Oyelese observed in his letter to Dr. Cervone of May 9, 2007, that he "would like to refer her to Dr. Pradeep Chopra, for comprehensive pain management and possible steroid injections." (R. at 325)  While Dr. Oyelese's October 1, 2007, letter to Dr. Cervone indicates that "[Plaintiff] did not follow through with injections with Dr. Pradeep Chopra," (R. at 429), as the ALJ noted, (R. at 15), Dr. Oyelese in a June 19, 2007, letter to Plaintiff's counsel stated that Plaintiff's doctors "had tried conservative management **including steroid injections**, NSAIDS, and physical therapy," (R. at 329)(bold added).  As for Dr. Brecher's statement that "[Plaintiff] is not interested in treating in our

38

fibromyalgia program," (R. at 449), Dr. Hubbard observed on January 16, 2009, that Plaintiff was treating at Neurohealth for her fibromyalgia, (R. at 450).

The ALJ was free to disbelieve Plaintiff's testimony regarding the effects of her medications, her functional limitations, and her pain.  See Irlanda Ortiz, 955 F.2d at 769 ("It is the responsibility of the [Commissioner] to determine issues of credibility ....").  However, the ALJ was required to explain accurately her reasons for doing so, see SSR 96-7p, 1996 WL 374186, at *4 ("The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."), in accordance with the factors listed in Avery, 20 C.F.R. § 416.929(c)(3), and SSR 96-7p.  Thus, I recommend remand for further consideration of Plaintiff's credibility in light of all of the required factors.

### Summary

The Court finds that the ALJ's determination to afford the opinions of Drs. Cervone and Oyelese limited probative weight is not supported by substantial evidence in the record.  Similarly, the ALJ's step two finding that Plaintiff's migraine headache condition is not severe is unsupported by substantial evidence.

Finally, the ALJ's explanation for her credibility finding fails to comply with the requirements of <u>Avery</u> because it does not address the side effects of Plaintiff's medications (which Plaintiff testified were significant) and overstates or mischaracterizes Plaintiff's testimony regarding her daily activities.  For these reasons, such credibility finding is not supported by substantial evidence.  Accordingly, I recommend remand for further administrative proceedings consistent with this Report and Recommendation.

## Conclusion

The Court finds that the ALJ's determination that Plaintiff is not disabled within the meaning of the Act is unsupported by substantial evidence in the record and contains legal errors.  I therefore recommend that Plaintiff's Motion to Reverse be granted to the extent that the matter be remanded for further administrative proceedings consistent with this opinion.  I also recommend that Defendant's Motion to Affirm be denied.

Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within fourteen (14) days of its receipt.  <u>See</u> Fed. R. Civ. P. 72(b); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. <u>See</u> <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir.

1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605

(1st Cir. 1980).


<u>/s/ David L. Martin</u>
DAVID L. MARTIN
United States Magistrate Judge
September 28, 2010

41